to represent Brian Pardo and Scott Peden in this appeal. The SEC acknowledges in its brief that the district court's judgment is flawed. The question then before this court is just how badly flawed that judgment is. I will attempt to address two issues this morning. The first, calling for a reversal in rendition that the SEC take nothing, is the overriding question of whether the SEC proved a misrepresentation or omission in the LPHI's annual and quarterly filings. And then the second issue that I hope to address is to talk about the excessive civil penalty assessed by the district court. And in that instance, there are multiple options that the court could pursue, and I will address those momentarily. Let me ask you one preliminary question. What caused LPI to fail? LPI failed, filed bankruptcy shortly after this judgment occurred, right? Would LPI have gone under otherwise? There's nothing in the record that indicates that that would be the case. In fact, I believe in the record with regard to the motion to appoint receiver,  there is evidence placed in the record by the SEC that the reason, the sole reason the bankruptcy was filed was the judgment entered by Judge Allen in December of 2014. Your Honor, I'll turn to the evidentiary challenge. Section 13A is the claim by which the SEC alleged that LPHI's annual or quarterly reports from January 2007 to November 2011 contained a material misrepresentation or omission pertaining to life expectancy estimates used by LPI for life settlements. And I'll come to that term in a moment. The SEC's theory at trial was that LPHI's 10Ks were misleading because the filings disclosed something as a contingency that the SEC alleged had already occurred. Now, it's uncontested the filings, specifically the annual reports, disclosed that life expectancies could be underestimated and that as a result LPI could lose purchasers and that those losses could have a material adverse effect on its business. The essence of the SEC's contention at trial was that by 2007, LPI already knew that its life expectancy estimates for life settlements was systematically and materially understated. It's important to note that the SEC specifically chose to pursue its claims based only on life expectancies arising from life settlements. It's clear in the record, even Mr. Rubin testified, he couldn't give an opinion about biattical settlements relating to terminally ill patients. And understandably, the SEC didn't want to get into an argument with the jury weighing the humanitarian benefits of a biattical settlement for a terminally ill patient. In light of the fact that industry-wide biattical settlements were going beyond LEs because of new treatments, particularly for AIDS patients. So they wanted to carve that out and focus expressly on life settlements. It's in the complaint, the admitted complaint, and the jury charge. LPI was just entering the life settlement business in 2004. So by 2007 or even 2008, life settlements with a five-year life expectancy would not even have had time to exceed the estimated LE. Pardo and Peden were entitled to a reversal in rendition of judgment because the SEC failed to offer substantial evidence that they knew. This was one of my questions that I didn't see in the briefs about the life settlements. In my mind, this was like buying bonds that are close to maturity. And the point was to estimate how close to maturity, that is to say what was the approximate life expectancy. And what are the economics? Generally, would the company have bought policies that were ten years away from the person being expected to die? Or was it trying to buy, I'm not talking about Dr. Cassidy, but was its business model based on estimates of a five-year shorter mortality? Your Honor, in the early days of life settlements, the annual reports pointed out that typically that was someone over 65 with a life expectancy of ten years or less. As time went on, and this is a dynamic market, as was testified at trial, typically the insureds were in their low 80s. There are evidence some in the age of 79, but generally with a life expectancy of less than ten years. And if I could nitpick just a bit, LPI did not buy insurance policies. They facilitated the purchase by investors through a third-party escrow agency, and that's important to the revenue recognition issue. But they did have their own portfolio of these equity funds. They did own interest because they bought them back from purchasers through either settlements or other events that took place. And there was a period of time where they compiled quite significant. And these are reported in the annual filings. That's not an issue that is at all dispositive on the appeal. So that by 2007, which is the beginning period that SEC claims life partners and therefore Pardo and Heaton should have known that the life expectancy were understated. There really wasn't time for anyone to be aware of that. Although the SEC points to testimony by two of LPI's licensees as evidence that an understated LE would be important to a purchaser, they had no evidence that that was actually the case. Instead, they were asked about some one-off instances where a file had a life expectancy estimate from Dr. Cassidy and a third-party life expectancy estimate. Never in the course of this trial did the SEC demonstrate that those third-party estimates were in LPI's file when they purchased, when they facilitated the purchase of a life settlement on behalf of its customers. In fact, if you look at the chart in the SEC's brief, it's pretty clear two of the 17, Staff Attorney Adkins testified about 18, they show 17 in the chart. Two of the insureds had multiple policies. And it was not unusual for brokers to send in an old package with a new submission. And so what's important here is the jury, no reasonable jury would have enough information to look at 17 or 18 instances out of hundreds and hundreds and hundreds of files where there was an unsolicited life expectancy estimate by a broker who submitted it to life partners that that somehow would impact the business of LPI and that Argo and Peen should have drawn conclusions from that when making its quarterly and annual filings. The sole basis of the SEC's claim is Larry Rubin's conclusory assertion that the life expectancies of Dr. Cassidy were materially short. But with regard to LPI's nascent life settlement business, his testimony at trial was that LPI had not experienced enough early deaths. If you look at his testimony, and particularly his testimony about Defendant's Exhibit 55, he acknowledges that all 161 life settlements as of February 28, 2007, and all 274 life settlements as of February 28, 2008, were within Cassidy's LA. What he says is that there should have been early deaths. This is where the distinction between Dr. Cassidy's deterministic life expectancy estimate and a probabilistic LE, such as those used by 21st Services, is critical. A probabilistic LE is presented as the mean life expectancy along a curve. Such a curve cannot be applied to Dr. Cassidy's deterministic LE, which is based upon medical prognosis. He's an oncologist, not on statistical data. So Rubin's testimony that along this curve you should have multiple deaths prior to the mean LE and then continuing for years actually beyond that additional death within a sample of 1,000, statistically speaking, cannot be applied to Dr. Cassidy's life expectancy estimate because he wasn't using that type of methodology. And the industry was very new. There's no standard of the industry, as Rubin testified, that required a particular methodology to be used. He's using hindsight analysis, looking back at the time of trial, at what Pardo and Peden should have known beginning in 2007 all the way up through November of 2011. How did Pardo and Peden hire Dr. Cassidy? There had been a prior physician who provided life expectancies, and when that physician died, an associate of his took his place. There is some testimony in the record about that, and I don't know that there's much that would illuminate that. Judge Nowlin limited each side to seven hours of trial presentation. And so you're not going to find much detail about anything in this case. So I can see why, for a period of time, a doctor who knew about treating AIDS patients or an oncologist, I suppose, could have had sufficient experience to say the likelihood that this patient with this kind of manifestation is going to live X amount of time. I find it a little harder to believe that a doctor, let's say, I don't know whether he was an internist or general practitioner, could look at a medical file of an 80-some-year-old person, within the past decade at least, and say, you know, this person has heart disease, they have high cholesterol, they're overweight, therefore I think they're going to die in less than five years. I mean, this seems like an unusual way to estimate life expectancy. Well, and at first blush it might. The thing is, there is nothing in the record to challenge that. Ruben said he wasn't even going to try to challenge Dr. Cassidy's methodology. And so we don't know whether... So there's not a deal that this was a whole thing was a flim-flam based on, you know, snake oil estimates of life expectancy. That's not the way the SEC presented this case. They were presenting it purely on a hindsight statistical analysis. Could have been better. It very well could have been. In fact, the record shows in 2011 two things happened. LPI, because of market demands, began to use 21st services to provide a second life expectancy estimate. And then when they sold life settlements beyond that, they went with the highest of the two. The evidence shows that from March 2011 to November 2013 that Cassidy's estimates were longer than 21st services 65 percent of the time out of 1,840 policies. Now, Dr. Cassidy testified that several years before trial... Pardo. Is it Pardo? I'm sorry. Pardo. Pardo is the president. With inside evidence that showed that the life expectancies were short. Your Honor, that's probably referring to Mark Embry, who in 2008 provided some very limited data regarding the performance as they were – the expectancies were just now beginning to be reached. And he demonstrated that 13 or 14 out of that initial pool had not yet matured. The average was 13 months. If you look at Ruben's curve, if you apply his curve, that's not unusual at all to have such a small percentage exceed by 13 months. And what's more important is that was shown to be an error. Mr. Pardo said don't release that. I want it to be checked. You better get to the damage. Yes, Your Honor. Let me address the damage issue. The main thing we need to address here is that Judge Nallin entered a multimillion-dollar penalty when the level two penalty requires fraud, deceit, manipulation, or deliberate or reckless disregard. We have a jury finding under 13A where the jury is specifically told there's no requirement that LPI have acted knowingly or recklessly to have violated these provisions. Even under the false certification claim, it's not necessary that there be a heightened scienter. The SEC has not cited any authority for the novel proposition that when you have a jury trial, it is sufficient for the district court simply to look at the record and recite evidence of a heightened degree of scienter in order to enter a judgment based upon that level two penalty. So under level one, the maximum penalty after March of 2009 was $7,500. And given that the SEC's argument in its brief is that at least by the end of 2008, Pardo and Peden should have known, that knocks out eight of the reports that were filed in 2007 and 2008. But more importantly, when there's a jury trial, you need a jury finding of multiple violations to have multiple penalties. So our primary argument is you should reverse and render. If you don't, rule in our favor on the first issue and a maximum penalty of $7,500 each. For how many violations? For one single violation. The jury was not asked to find multiple violations, so the SEC has waived any ability to request penalties for multiple violations. All right. Thank you. And you've reserved your rebuttal time. All right, Mr. Vedder. May it please the court, Benjamin Vedder for the Securities and Exchange Commission. I think it's important here to understand at the outset how life partners business function. Life partners would go out and they would find seniors who had life insurance policies to sell. Now, sometimes these seniors would approach them through brokers. Then LPHI would get their in-house guy, Dr. Cassidy, who was out in Reno, Nevada, to look at the seniors' medical records, and he would make a prediction as to how long that senior would live. Now, this wasn't simply a prediction. You'll see from the record what Dr. Cassidy was doing is he was taking the CDC general population mortality table, using that as a baseline, and then making adjustments to that based on his medical judgments about the life expectancy of this particular senior. LPHI called that prediction their life expectancy calculation or their LE. The evidence here at trial that the jury heard showed that the shorter the predicted lifespan of the senior insured, the more money LPHI could charge its retail purchasers for fractional interest in their policies and the more money LPHI would make on the transactions. But the flip side of that is that they'd be paying the elderly person less, right? Yes, yes. So people wouldn't want to sell them policies if they couldn't get what they thought they were owed on them, right, because there were competitors in the market. That's true, but the record also shows that the brokers who were presenting these policies to LPHI were typically presenting one of these actuarial LEs along with the package of information that went to LPHI. And you can see it's actually the chart referred to in our brief by Mr. McKenzie on page 13 of our brief. You can see just an illustration of the fact that these actuarial LEs were significantly longer than life partners' in-house LEs. So, in effect, what was happening was the senior insureds were making a decision to sell their policy on the basis of the actual actuarial LE that their broker had obtained for them. Now, LPHI was using different data to sell these policies to retail purchasers. Now, in our brief, we explained that when they were dealing with their institutional clients, they were using the actuarial LEs because the institutional clients insisted on it, and I acknowledge the institutional business was a relatively small part. Well, let me get to the bottom here because the fact is that you tried this to verdict. A gigantic judgment was entered, and they filed Chapter 11. Would they have gone under as a basis of these alleged misrepresentations? We believe the answer to that is yes, Your Honor. Now, again, the commission did not really have access to LPHI. You don't care. You're just charging them a gigantic amount of money so that the people who did have these arrangements are now going to, you know, all the people who I assume are a lot of investors, are just going to lose just about everything either because of the overhead of Chapter 11 or the fact that the company is not able to pursue the investments anymore. Well, Your Honor, I guess two answers to that. I confess that I am not a bankruptcy attorney. I do know that the bankruptcy is ongoing. The trustee has filed a very thorough report with the bankruptcy court, and in the order appointing the bankruptcy trustee, the bankruptcy judge made a number of findings about LPHI's financial condition. So beyond that, I can refer the court to the record. But to the question of how our verdict led to the bankruptcy, the sequence of events there was our verdict or the judge's order led to the bankruptcy. The judge entered his order, and then LPHI filed a notice of appeal. Of course, they did not post a bond, and then they filed motions to be relieved of the bond requirement in order to prosecute their appeal, and in that process submitted evidence. Most of this is sealed, so it's not in the public record, but it is available in the district court's records. They submitted evidence about their financial condition, attempting to establish their inability to post the bond. That was actually the first solid evidence the commission had about their financial condition between basically the close of discovery and their attempt to avoid the bond. Now, our belief is that that evidence shows why these LEs were important and how eventually the music was going to stop here. Okay, so let me ask you a question, though. You have conceded that the judge miscalculated the amount that was owed. We conceded on the civil penalty, Your Honor, that there was an error in our papers on the total number of violations that we proposed to the judge. And how significant would that be to the judgment? Why didn't youóI mean, we couldóthis court has authority to modify the judgment if, in fact, it's just a clerical calculation. I'd like to clarify one thing, Your Honor. Life Partners Holdings, Incorporated, which was the entity that declared bankruptcy and that subsequently dragged its wholly-owned subsidiary into the bankruptcy with it, is not in this appeal. That has been severed out and remains pending. Now, you know, as to the judgments against Pardo and Peden, which are in front of this court, on the question of the civil penalty, one ofóand quite honestly, Your Honor, we discovered this when we got Mr. McKenzie's brief and we went back and we carefully looked at what had happened below. I asked you if it was something that's amenable to a clerical calculation. I don't need to know the whole story. So what's the answer to that? Well, yes, Your Honor, we believe that it's amenable to a clerical calculation. However, I would caution that we are not necessarily in agreement with Mr. McKenzie yet on the total number of violations. We've conceded that the number we proposed is wrong because we double-counted the 10 Qs and 10 Ks. But we do not necessarily agree with him that they can only have one violation. In fact, we think it's just incorrect. That's fine, but even if you double-counted, would the difference be between $23 million and $46 million? Well, Your Honor, I believe $6 million is the penalty against Mr. Pardo, which is the largest penalty, and that may be reduced, I believe, to somewhere in the neighborhood ofó again, I hesitate to say a number that the court's going to hold me to, but without the double-counting, I think it reduces to the range of $4 million. But again, Your Honor, I'm hesitant toó It would be as if you gentlemen had a basis to negotiate before coming on appeal, but that's just my humble opinion. With regards to the civil penalty, perhaps we could have had some discussions. We actually considered asking this court to remand the case for corrective action on the civil penalty, but given that Mr. McKenzie was also challenging the Section 13A verdict, we really didn't see where that would be a productive use of this court's time and the district court's time  What are we going to tell the district court how to calculate these penalties? Well, Your Honor, we think it's sufficient simply given that we've conceded to the erroró We can't just send it back without any guidance, can we? Well, to the extentógiven that we've conceded an error and the calculation of penalties is in the district court's discretion in the first instance, we think, especially given the other issues in the case, such as SOX 304, that it would be appropriate for the district courts to just recalculate the entire remedies package. You know this judge is basically in retirement now, so it may not be a simple matter at all, but that's justó Why aren't youóI mean, if you've conceded error, I mean, why aren't you and or counsel opposite in the best position to calculate what it really should be as opposed to saying it should go back down for someone else, much less, as Judge Jones alludes, Judge Nolensóhe's not going to be the one to do it, I can say that. So without input from counsel on this, you know, I don't get it. Well, Your Honor, again, I believe that there's a very significant difference of opinion as to the scope of the error. Mr. McKenzie has taken the position that there is only one allowable penalty here because of the jury's verdict on Section 17A. The commission just categorically disagrees with that. Now, we accept that, obviously, we cannot treat 10-Qs as though they were 10-Ks, and we cannot treat 10-Ks as though they were 10-Qs. That is actually, you know, a calculation error. He's actually proposing a different standard, which is essentially that the jury must make all of the factual findings predicate to a civil penalty. And with respect, Your Honor, that's just not so. Tull decided this issue, and there has been no subsequent case out of the Supreme Court indicating that Tull is incorrect on this point. So, yes, Judge Nolen was very much within his discretion to make whatever findings were necessary to support the second-tier civil penalty. Even contrary to a jury finding that had the same basic issue. Well, I don't believe that Judge Nolen's findings are contrary to the jury findings here, Judge Jones. In fact, Judge Nolen, in his order, noted that he did not vacate the 17A1 verdict because of a lack of scienter. He said there was abundant evidence that these life expectancy calculations were short and that Mr. Pardo and Mr. Peden knew that they were short. He vacated the 17A verdict on a technical point, and obviously we disagree with that, you know, the grounds that Judge Nolen used. However, we believe that the jury did find a scienter violation here with 17A1. And, you know, Judge Nolen could rely on that. And, again, he was the trial judge present for all 14 hours of evidence. And, you know, that was his evaluation of it. Well, if we agreed with counsel often, I'm not saying we will, but if for whatever reason we found that you've got to have these multiple violations, etc., and you can only give one, where does that leave you in light of what you've conceded otherwise in that? Where does that leave the case? I mean, assuming, you know, we've got a joint issue relative to whether you need multiple violations or not. His argument to us a minute ago was that you needed to have the multiple violation findings by the jury in order to get the multiple penalties, etc., etc. So I'm just saying, assuming for the purpose of my question, if we were to find his argument on that meritorious in our ruling, I'm just saying where does that leave you? I don't mean you personally, but where does that leave the SEC and whatever otherwise was determined in this case? Well, if this court were to accept his argument as I'm understanding it, that the jury must find all of the factual predicates for a penalty amount, I guess that would leave us in a tight spot because we then probably would be stuck with a single violation in this case. But I would like to emphasize two points again, Your Honor. That would be inconsistent with Tull. And two, they never asked for a jury instruction here or a jury interrogatory on factual findings for the penalty. If you go back and you look through the trial record, nowhere in their request of jury instructions do they ask for a jury finding. But if the SEC is bringing the charge, I mean, whose burden would it be? In other words, I hear what you're saying, but if the SEC is levying this and on and on and on, I mean, I don't know the answer. I mean, whose burden is it? If you land it out and the jury has to find it, is the answer, well, he, meaning his side, didn't ask for that delineation? Or is it that if you're the charge in the party that's presenting the allegations that the jury has to find, is it the burden? I don't know the answer to the question. That's why I'm asking. I'm saying, whose burden is it? I mean, lots of jury cases, you know, depending on what you want to find, the one bringing it, you know, you've got to lay it out to be found. If you don't do it, how does that necessarily inure to the detriment of the other side if it was your affirmative to do it? And I don't know the answer. I'm just asking in light of the fact that you obviously see this aspect differently. Well, Your Honor, I— Did the defendants object to any jury instruction? They objected to the jury instruction with respect to the insider trading charge, but that is not an issue here on the appeal. The commission did not cross-appeal the insider trading counts. So, no, they did not object to the lack of an interrogatory on facts underpinning civil penalties. And in question to your—in answer to your question, Chief Judge Stewart, I believe it would be incumbent on the defendants to ask for an interrogatory if they believe they are entitled to factual findings for the penalty. Under Tull, it's clear. Tull is very clear, and this isn't from the 1980s. This is the established law that you are—the Seventh Amendment entitles you to a jury trial on liability when there is a civil penalty at stake. But Tull also states that once liability is determined, it is within the power of Congress to assign to a judge the ability to set an amount of penalty. Now, under our penalty statute, it flatly says the district court shall determine the appropriate amount of the penalty on the facts and circumstances of the case. So we think in light of the statute and in light of Tull, it clearly would be incumbent on them to request special interrogatories. And that's consistent with this court's precedent in McDaniel v. Anheuser-Busch where their particular party had not asked for special interrogatories and later complained of it, and the court said, well, you didn't ask. So if you didn't ask, even if you had a right to it, you effectively waived it. Now—and I would also point out that the Eighth Circuit just last month rejected an argument. In fact, someone in the Eighth Circuit had asked for special interrogatories that would essentially serve factual finding basis for the civil penalties. The district court declined to give them, and the Eighth Circuit said the district court was not required to do so under Tull. There was no error there. Well, but again, you can look at it on this other level, which is that the—what the jury did—we're getting civil penalties for violations of 13A, right? Yes, that's correct. Okay. And the jury only found—they were only allowed to find a violation on a—on sort of a non-intent basis, correct? That's correct, Your Honor. And the judge is contradicting—he's inconsistent with that in a sense by saying, well, this was not non-intent. Well, yes. Yes, Your Honor. If Section 13A had been the only thing the jury found on— But that's the only thing that the penalties are assessed on. That is the only thing that the penalties were assessed on, but again, I point you back to Judge Nowlin's order where he said, look, they found a scienter-based fraud here under Section 17A1. I vacated it not because of a lack of scienter evidence in the record. And then he proceeds to award or to levy the second-tier penalties. Now, I don't think there's anything improper about Judge Nowlin relying on his understanding of the record in front of him based on his understanding of what the jury did. And I would also point out, Your Honor, it's not uncommon for the SEC to obtain second- and third-tier penalties in non-scienter cases. Section 5, for example, is not a scienter-based offense. That's just selling of unregistered securities. There's no scienter requirement. And we routinely get second- or third-tier penalties there. In fact, SEC v. Kern, which we cite in our brief, is a Second Circuit case which affirmed third-tier penalties, which is a heightened scienter standard plus evidence of a probability of investor losses. And in addition, the Northern District of Texas has awarded second-tier penalties. Well, with due respect, I guess what hangs me up in this case is I've seen 10B cases. I've seen cases where receivers were appointed for all sorts of grotesque securities violations. I think in my experience, this is the first time I've seen a 13A case where the jury rejected 10B liability, and that's the only basis for penalties. And it's not a question of nondisclosure. It's a question of inadequate disclosure. No, Your Honor, I understand your question, but I'm not – I mean, it's like an oil company saying, well, if you invest in our – this company, we do oil drilling, and some of the wells are going to fail, and some of them are not going to fail, and that's going to have an effect on our deal. And then you show, well, historically, a lot of their wells have failed. Well, as long as they describe the history as they're supposed to do it, and then they say there's a risk, I don't see what can be more risky than betting on how much longer an old person is going to live in the last decade. Now, that might have been different back in the 50s and 60s, but in the last decade, life expectancies have been taking off. Well, I agree with Your Honor that this is a risky investment, obviously, but I think perhaps that it's not exactly a nondisclosure case. And what I mean by that is if you go and look at your 10-Ks – and I'm actually quoting from a 10-K here. What they said was if we underestimate the average life expectancy. And then they later say – they tell their shareholders that if it underestimates the LEs, they could lose purchasers or policy sellers, and those losses could have a material adverse effect on our business, financial condition, and results. That's from Exhibit G26, the government's Exhibit G26, one of their 10-Ks. So I guess to me this case is very much like Huddleston, which is an older case from the circuit, where you can't actually represent something as a risk when you know it's a reality. Their life expectancies were underestimated, but they said – What do you say about their argument that as of 2007 and 2008, at the very least, since their life expectancies were tailored to five years or less, they couldn't have had that knowledge within five years? Because obviously a bunch of the people were going to die after five years, and they all might have died of five years and two months. That argument, Your Honor, has two premises behind it. One of it is that the viaticals don't matter, and I disagree with that because – Your whole case is built on the life settlements. I'm not talking about viaticals. Our allegations in our case is that their life expectancy calculations were just substantially short. Now, when they knew they were short, they should not have continued to say that there's a mere risk.  So you're saying that they're selling viaticals and they're selling life expectancies, and the viaticals – then everybody in the industry was wrong about the viaticals at this point in time, right? Pretty much everybody, yes, Your Honor. All right. Did you sue everybody in the industry? Well, no, Your Honor. It was the actuarial companies that were creating the life expectancies were the ones that lengthened all their life expectancies, and I'm not aware of any – I guess I – I don't see – your whole case is based on life settlements, not viaticals. Is that correct? In the sense, yes, Your Honor, that by the end of 2008, our position is they had sufficient data to know that their life settlement numbers were short. And I see I'm out of time. Would you like me – shall I continue with the answer? Try to explain how you fold viaticals back into life settlements when your whole – if your whole case is built on inaccuracies about life settlements, how does the inaccuracy about viaticals, which is a different market, so to speak, feed into life settlements, which is what you sued them for? Well, Your Honor, our case is that they knew their life expectancies were wrong, and if you want to talk specifically about life settlements, they started to – Well, you talked, but you charged them with that, right? Yes, we did charge them with that. Okay. So it's your case. I'm not – it's not my preference. It's your case. On the life settlements, just life settlements, our expert, Larry Rubin, testified that when I looked at just life settlements, they were short. And you can also see confirmation of that in Mark Embry's analysis. His analysis in an August – I believe it was an August 2008 email, he looked at the life settlements that Life Partners had issued in 2004, and he discovered basically that at least or more than half of them would be beyond their Cassidy LE by the end of 2008. Now, this is their own internal data telling them this. Now – Okay, go on. I'm sorry. Mr. McKenzie suggests that that's not really sufficient data because you can't use Larry Rubin's analysis to determine that their life settlements were short. But that just misunderstands, I think, what life expectancies are supposed to be. A life expectancy within the actuarial world is not a prediction that someone will die in four years. It's a statement of probability. So if you have a group of 1,000 people and they all have a four-year life expectancy, you would anticipate 500 of them to have died by year four. And what was the sample that Mr. Embry had in 2008? Mr. Embry had a sample set, I believe, of 37 policies. 37 out of – which was less than 5% of the policies at that time? Well, those were 37 life settlement policies, Your Honor. Again, the rest were viatical policies. So just looking at Mr. Embry's email, I think that they have data in front of them telling them that there's a problem with their life expectancy numbers. Okay, well, all right. With respect, are there any further questions from the court? So what do you request the court to do? We have a rather lengthy request for relief in our brief. Essentially, we're asking the court to remand the case for recalculation of the civil penalty, to affirm the Section 13A verdict, to reinstate the Section 17A1 verdict, and to send the case back down with instructions to reconsider the SOX 304 claim. I believe that's everything. All right. But I do direct you to the actual statement of relief in case I've forgotten something. Thank you, Your Honor. All right, thank you, sir. Back to you, Mr. McKenzie, for rebuttal. Thank you, Your Honors. If I may correct one statement my friend Mr. Vetter made when he said that typically brokers submitted third-party LEs, that's not correct. There's nothing in the record that indicates that's typical. In fact, the evidence is to the contrary. It was a rare event, and Staff Attorney Atkins presented 18 files, and she specifically testified. She went through the voluminous documents, and when she found both, she printed them. So to say that's typical is simply not supported by the record. Is it fair to say that the jury found this case a little hard to follow? Yes, and you can tell that from the number of notes they submitted in the sealed record to Judge Nallen. And, Judge Jones, I want to get right to the heart of the issue regarding Scianter because in this case the jury was asked a 10B question. That was the SEC's fraud claim. The jury said no. Out of left field, the summer after the jury trial, the SEC requests a penalty, including against LPHI, of $2 billion. There was no indication prior to trial that they would be seeking a second-tier penalty, notwithstanding the jury saying no fraud. Regarding 17A, it's important to note the judge specifically instructed the jury. A distinction between 10B and 17A is you must find Scianter under 10B, and you can find 17A based upon mere negligence. Now, it's undisputed there was a clerical error in the verdict form. The verdict – the jury charge instructed the jury you can find 17A based on negligence. The verdict form in one place said 17A, in another 17A1, which would be a heightened Scianter. But the judge threw that out. It was a flawed submission from the beginning. And he properly threw it out because there was no evidence of a problem with revenue recognition, which was also specified in that question. The idea that we can revive this jury finding that was set aside – when the jury was instructed you can find 17A based upon negligence – to support a heightened Scianter for multimillion-dollar civil penalties is something that I find unfathomable. And to regard to the question, what will the court do if it does find evidence that Pardot and Peden should have known by November 2011? Actually, the last report the judge now relied upon was in the summer of 2011. This is at footnotes 6 and 7 of the judge's final judgment order. He sets out nine reports prior to the penalty increasing to 7,508 after. So already we have to throw out the first eight that come before the period of time the SEC now says by the end of 2008 we should have known because that's all Rubin ever testified about in a very conclusory form. Now we're left with those that come after the penalty went to 7,500. How do we know when it was the SEC's burden when Pardot and Peden should have known that the LEs were understated? It's the SEC's burden to find liability before it can assess a penalty. And you're saying the judge didn't make that finding? The judge simply said there's evidence in the record of reckless disregard. But when you have a jury trial, that's not sufficient to then go from a Tier 1 to a Tier 2. And to be clear, Mr. Vedder did contact me in November of last year before the SEC filed its brief to apprise me of their analysis regarding the incorrect calculation of penalties. I won't get into that discussion, but clearly we have a difference. Our view is there's not substantial evidence of a 13A violation reversed and rendered that the SEC take nothing. But even if you get past that, we're at Level 1. The SEC is asking for Level 2. We're at one violation because they had one jury finding. They're still looking for multiple, yet not yet telling us how many violations. At the most, it could be those two annual reports that come after the date that they now say we should have known, the two annual reports after the end of 2008. Is this all explained in your brief? Yes. What's your response to the question I asked him about this whole burden? He cited McDaniel v. Anheuser-Busch. He cites to us an Eighth Circuit case saying there was no requirement for the trial court to give special instruction, if not ask. Is that dealt with in your brief? Because if it is, I won't believe you there at the podium. No, it's not, and I don't have the cites on those. I'll get those from Mr. Vetter if we need to follow up with briefing. We can, but it's not a party's burden when the issue hasn't been raised. At the time of trial, they had a finding that would have been heightened science, a question, 10B. The jury said no, and so when you drop down to 13A, at most that can be a Level 1. There was nothing in this case that suggested we need to granulate these findings so we know what they were. It was set out very clearly. Question 1, fraud. The 13A question, I believe it was 5 and 6, for Aiden and Nevedi . . . Yeah, but when you get to that point, I'm just trying to work back basic trial of a case. When you get to that point, notwithstanding that you . . . not you, but you've got a theory of how this ought to shake out, but it doesn't. Trial judge says you got seven hours. You think you ought to have two days, but as many of these judges do, they say that's how long you got. You've got to adjust. Lawyers have to adjust to the window and get it in, right? I'm saying, I get what you're saying in terms of the basic scenario, but he tried it the way he did, body, body. You get to the point it's going to go to the jury, though I hear what you just said, but now that you're in the reality box of he's getting ready to give it to the jury, I still come back to say, okay, what's your best case? Not your argument. I got that. He gave us one. We're going to have to look at it, but I'm saying what's your best case for saying, okay, they charged it, and if they don't lay it out that way, King's X. Whereas he's saying, well, when you get down to this 13A, that's not so. I mean, I hear the argument. I'm just trying to get to what's the best case that's helping inform that question. And before I heard the reference to McDonnell, I would have said to the court, as I anticipated, neither party briefed any case that suggested that a district court, except in a default setting. There are plenty of default judgment settings where the district court presumes the finding arising out of the default. There is no case that I was aware of before that one was cited that suggested the district court didn't need a jury finding when it went to the jury. Okay. Well, I mean, we're going to look at it. We're going to do our job. Probably just the whole point of having you all here is to help edify this question. If it's a straight legal question, then if there's a case out there, we want to know where it is. But anyway, I just wanted to know your position on it. Okay. Thank you. We'll look at it. All right. Thank you. I'm sorry. Okay. All right. Thank you. Perfect. All right. We'll call up the